**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

**December 13, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

---

JENNIFER L. COOPER; EUGENE
DIXON; FRANCIS J. CIZMAR; ANNA
PENNALA; KATHLEEN DAAVETTILA;
CYNTHIA BRUNELL; KARYN
CHOPJIAN; ABBIE HELMINEN,
individually and on behalf of all others
similarly situated,

    Plaintiffs - Appellants,

v.

US DOMINION, INC.; DOMINION
VOTING SYSTEMS, INC.; DOMINION
VOTING SYSTEMS CORPORATION;
HAMILTON PLACE STRATEGIES,
LLC,

    Defendants - Appellees.

No. 22-1361
(D.C. No. 1:21-CV-02672-PAB-STV)
(D. Colo.)

---

### ORDER AND JUDGMENT[*]

---

Before **HARTZ**, **MORITZ**, and **ROSSMAN**, Circuit Judges.

---

Plaintiffs Jennifer Cooper, Eugene Dixon, Francis Cizmar, Anna Pennala,

Kathleen Daavettila, Cynthia Brunell, Karyn Chopjian, and Abbie Helminen filed

this action against US Dominion, Inc., Dominion Voting Systems, Inc., Dominion

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. But it may be cited for its
persuasive value. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

Voting Systems Corporation (together, Dominion), and Dominion's public-relations firm, Hamilton Place Strategies, LLC (HPS), asserting two 42 U.S.C. § 1983 claims under the First Amendment and the Equal Protection Clause, one claim under the Racketeer Influenced and Corrupt Practices Act (RICO), 18 U.S.C. §§ 1961–1968, and one claim under Colorado's civil-conspiracy law. We affirm the district court's dismissal of plaintiffs' claims because they fail to allege—and in one instance, affirmatively waive—the concrete and imminent injuries necessary to establish constitutional standing.

### Background[1]

Plaintiffs were poll watchers and challengers in Michigan during the November 2020 election. After witnessing irregularities at their polling stations, they each completed an affidavit affirming as much. None of their affidavits mentioned Dominion. But the affidavits did result in each plaintiff receiving a letter, between late December 2020 and early January 2021, from Dominion's defamation law firm.[2]

The subject line of the letters was "Notice of Obligation to Preserve Documents Related to Dominion," and they provided:

> Our firm is defamation counsel to . . . Dominion . . . . We write to you regarding the ongoing misinformation campaigns falsely accusing

---

[1] We take these facts from plaintiffs' operative first amended complaint. *See Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020).

[2] The complaint does not say how Dominion identified plaintiffs. But Dominion's briefing in the district court and on appeal explains that Dominion learned about plaintiffs' affidavits because they were "associated with and attached to . . . litigation filed by Sidney Powell." Aplee. Br. 1; *see also King v. Whitmer*, 556 F. Supp. 3d 680, 688–89 (E.D. Mich. 2021), *aff'd in part, rev'd in part*, 71 F.4th 511 (6th Cir. 2023).

Dominion of somehow rigging or otherwise improperly influencing the outcome of the November 2020 U.S. presidential election. In recent days we sent letters to Sidney Powell and various media entities demanding retraction of their myriad defamatory and conspiratorial claims about Dominion.

Dominion is prepared to defend its good name and set the record straight. Litigation regarding these issues is imminent. This letter is your formal notice to cease and desist taking part in defaming Dominion and to preserve all documents and communications that may be relevant to Dominion's pending legal claims.

App. vol. 1, 19 (footnote omitted). Each letter included a footnote clarifying that it was "a retraction demand pursuant to relevant state statutes and applicable rules of court." *Id.* at 19 n.2. The letters also detailed what information plaintiffs were expected to preserve and asked each plaintiff to confirm with the law firm that they received the letter and intended to preserve the requested information.

Plaintiffs describe these letters as "boilerplate directives meant to instill fear and intimidation." *Id.* at 22. They allege feeling overwhelmed and experiencing a variety of negative emotions because of the letters, including "dread and fear," confusion, concern, and nervousness. *Id.* at 28. Some responded by purchasing home security equipment.

About nine months after receiving the letters, plaintiffs filed this class-action lawsuit for damages against Dominion and HPS, alleging that they each "sustained an actual injury in the form of damages to [their] property and violations of [their]

3

constitutionally protected rights" because of the letters.[3] *Id.* at 29. Plaintiffs asserted two § 1983 claims against Dominion for violating their First Amendment and Equal Protection rights, as well as a RICO claim and a state-law civil-conspiracy claim against both Dominion and HPS.

The district court dismissed plaintiffs' complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). It first determined that plaintiffs lacked constitutional standing to assert their First Amendment, RICO, and civil-conspiracy claims because the complaint failed to adequately allege an injury for those claims. And although it held that plaintiffs had standing to assert their equal-protection claim, it nevertheless determined that they failed to state such a claim because the complaint did not plausibly allege that Dominion was a state actor at the time the letters were sent.

Plaintiffs now appeal.

## Analysis

We begin, as we must, with the threshold jurisdictional issue of standing, which we review de novo. *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1190 (10th Cir. 2021). Standing doctrine derives from Article III of the Constitution, which limits the jurisdiction of federal courts to "[c]ases" and "[c]ontroversies." *Lujan v. Defenders of*

---

[3] According to plaintiffs, the letters were part of Dominion's "illegal [l]awfare campaign," a "coordinated campaign to intimidate Americans by waging and threatening to wage [l]awsuit [w]arfare . . . against anyone that speaks about anything negatively related to Dominion's possible role in election integrity and security." App. vol. 1, 16, 29.

*Wildlife*, 504 U.S. 555, 560 (1992) (quoting U.S. Const. art. III, § 1). "Standing 'ensures that a plaintiff has a sufficient personal stake in a dispute to ensure the existence of a live case or controversy which renders judicial resolution appropriate.'" *Lupia*, 8 F.4th at 1190 (quoting *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004)). A plaintiff seeking relief in federal court bears the burden of establishing Article III standing "on a claim-by-claim basis." *Id.* (quoting *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 813 (10th Cir. 2021)). To do so, a plaintiff must show that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

For standing purposes, an injury is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). To be concrete, an injury must "be 'real' rather than 'abstract.'" *Lupia*, 8 F.4th at 1190 (quoting *Spokeo*, 578 U.S. at 340). But it need not be "tangible"—some intangible injuries will be sufficiently concrete for standing purposes. *Id.* (quoting *Spokeo*, 578 U.S. at 340). And an injury is particularized if it "affect[s] the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560 n.1). As for imminence, "'threatened injury must be *certainly impending* to constitute injury in fact,'" meaning that "'[a]llegations of possible future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (alteration in

original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1231 (10th Cir. 2020) (quoting *Lujan*, 504 U.S. at 561). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (alteration in original) (quoting *COPE v. Kan. State Bd. of Educ.*, 821 F.3d 1215, 1221 (10th Cir. 2016)). In short, "plaintiffs must adequately allege a plausible claim of injury." *COPE*, 821 F.3d at 1221.

Here, the district court discerned several potential injuries from plaintiffs' complaint, including chilled speech, threatened litigation, and investment in home security systems, but it concluded that none of these supported standing for plaintiffs' First Amendment, RICO, or civil-conspiracy claims. Rather than challenging the district court's reasoning on these points, plaintiffs now highlight six "intangible injuries that [they] clearly alleged they suffered upon receiving and reading the letters": (1) intrusion upon seclusion; (2) confusion and emotional distress; (3) public disclosure of private facts; (4) deterred speech on nondefamatory matters; (5) violation of First Amendment rights; and (6) compulsion.[4] According to plaintiffs,

---

[4] Plaintiffs did not assert these injuries below. They defend their choice to assert new injuries on appeal by describing the briefing on standing below as "general," Rep. Br. 8, and the district court's interpretation of their complaint as "cramped" and "unduly blinkered," Aplt. Br. 35–36. But they do not dispute that they did not argue or assert these six intangible injuries below. We could decline, as the concurrence would, to consider these newly raised arguments as forfeited below and waived on appeal due to the absence of a plain-error argument. *See COPE*, 821 F.3d

these six intangible injuries establish standing for their First Amendment, RICO, and civil-conspiracy claims. Plaintiffs additionally argue that their alleged equal-protection violation establishes standing not only for their equal-protection claim, but also for their three other claims. We consider each point in turn.

## I.     Intangible Injuries

To determine "whether an intangible harm is sufficiently concrete to constitute an injury in fact, we look to both history and . . . the judgment of Congress." *Lupia*, 8 F.4th at 1191. In so doing, "we 'afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant[] and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation.'" *Id.* (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021)). And as to history, we consider "whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* (quoting *Spokeo*, 578 U.S. at 340–41). With these standards in mind, we analyze each of plaintiffs' six asserted intangible injuries.

---

at 1222 n.7 (finding several new-on-appeal arguments in favor of imminent injury waived); *Tompkins v. U.S. Dep't of Veterans Affs.*, 16 F.4th 733, 735 n.1 (10th Cir. 2021) (explaining that principles of forfeiture and waiver apply "even as to arguments in favor of subject[-]matter jurisdiction a plaintiff-appellant failed to raise below"). But with one exception discussed later, *see infra* Section I.D, we exercise our discretion here to overlook this preservation issue and reach the merits of plaintiffs' newly asserted injuries, doing so in part because Dominion does not argue this preservation problem in its response brief. *See United States v. McGehee*, 672 F.3d 860, 873 n.5 (10th Cir. 2012).

## A.    Intrusion Upon Seclusion

Plaintiffs first contend that "the letters intruded on the[ir] privacy," causing an injury "analogous to a common-law intrusion-upon-seclusion tort." Aplt. Br. 22. And indeed, courts have "readily recognized a concrete injury arising from the tort of intrusion upon seclusion—a tort protecting against defendants who intrude into the private solitude of another." *Lupia*, 8 F.4th at 1191; *see also TransUnion*, 141 S. Ct. at 2204 (recognizing that intrusion upon seclusion represents a "harm[] traditionally recognized as providing a basis for lawsuits in American courts"); Restatement (Second) of Torts § 652B cmt. c. (Am. L. Inst. 1977) (explaining that liability exists "only when [the defendant] has intruded into a private place[] or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs"). For instance, in *Lupia*, we held that the plaintiff had standing to raise claims under the Fair Debt Collection Practices Act (FDCPA) because the defendant debt collector "made an unwanted call and left her a voicemail about a debt, *despite her having sent written notice disputing the debt and requesting that it cease telephone communications*." 8 F.4th at 1191 (emphasis added). And in *Seale v. Peacock*, we similarly found standing to assert a claim under the Stored Communications Act because the plaintiff alleged that the defendant, "*without authorization*, intentionally accessed his [electronic] account." 32 F.4th 1011, 1021 (10th Cir. 2022) (emphasis added).

Plaintiffs rely on *Lupia* to argue that receiving the letters intruded on their privacy, causing an injury, because "[r]eceiving a personally addressed letter is not

materially different than receiving an unanswered phone call." Aplt. Br. 22. Yet plaintiffs' proposition overlooks a crucial distinguishing fact between this case and *Lupia*. There, we recognized the intrusion because the plaintiff had prior contact with the defendant corporation and asked it not to call. *See Lupia*, 8 F.4th at 1191. Here, by contrast, plaintiffs do not allege that they had any prior contact with Dominion. And unlike the plaintiff in *Lupia*, who pointed to the FDCPA, plaintiffs here have identified no specific statute in which Congress chose to concretize a cause of action for the intangible injuries they allege. In this context, the district court correctly held that receipt of a single letter (even one that falsely accused plaintiffs of defaming Dominion) did not intrude on their privacy.

## B.    Confusion and Emotional Distress

Plaintiffs next argue that the "confusion and emotional distress" they experienced after receiving letters "falsely charg[ing]" them with defamation is sufficient to establish standing. Aplt. Br. 22. In support, they first rely on *TransUnion*, which involved claims arising from incorrect formatting of reports that credit agencies must provide to individuals upon request. *See* 141 S. Ct. at 2213. The Supreme Court primarily held that all but one of the class members lacked standing to assert these claims because they presented no evidence that they had even opened the incorrectly formatted reports, let alone that they were confused or distressed by doing so. *See id.* In so holding, the Court noted in passing that both lower courts had concluded the named class representative had standing for these claims based on his allegations of being concerned after receiving the incorrectly formatted report. *See id.*

9

at 2201–02, 2213 n.8. The Court saw "no reason or basis to disturb" that conclusion because the defendant had "not meaningfully contested [the class representative's] individual standing as to those two claims." *Id.* at 2213 n.8. Thus, contrary to plaintiffs' position, *TransUnion* does not stand for the proposition that the experience of confusion and emotional distress upon receiving an inaccurate mailing is a concrete injury sufficient for standing. Rather, the Court passed on that question, having no reason to consider it.[5]

Moreover, as defendants highlight, we have held to the contrary. In *Shields v. Professional Bureau of Collections of Maryland, Inc.*, the plaintiff asserted claims arising from receipt of three debt-collection letters that "did not indicate the debt balance could increase due to interest and fees from the date of the letters," alleging that the letters confused her. 55 F.4th 823, 826 (10th Cir. 2022). We held that her allegations of "confusion and misunderstanding [we]re insufficient to confer standing." *Id.* at 830. We also suggested that the absence of any allegations that "the letters caused her to *do* anything" weighed against a concrete injury, as did the fact that "it would be unreasonable for a debtor in [the plaintiff's] position to believe that

---

[5] Plaintiffs also invoke *Southwest Forest Industries, Inc. v. Sutton*, 868 F.2d 352 (10th Cir. 1989). Using selective quoting, they assert that *Southwest Forest* stands for the proposition that "emotional distress from 'being falsely accused of lying' is sufficient injury to justify *actual damages*." Aplt. Br. 23 (quoting *S.W. Forest*, 868 P.2d at 356). But plaintiffs inaccurately characterize *Southwest Forest*'s holding. That case held in relevant part that a damages award for emotional distress caused by a wrongful termination of employment was not excessive under Kansas law. *See* 868 F.2d at 356. "[B]eing falsely accused of lying" was merely part of the evidence supporting that emotional-distress award. *Id.* So *Southwest Forest* has no bearing whatsoever on the standing issue in this case.

her debt would not continue to accrue interest." *Id.*

Plaintiffs seek to distinguish *Shields* by highlighting that the letters here asked them to take various actions, such as responding, refraining from speaking, and preserving documents. But aside from alleging that one plaintiff tried to call Dominion's defamation counsel, the complaint does not say that any plaintiff actually responded, refrained from speaking, or preserved documents. Thus, plaintiffs' asserted confusion and emotional distress is insufficient to establish an injury for Article III standing.

### C.      Public Disclosure of Private Facts

Next, plaintiffs argue that they were injured when HPS shared their names and addresses with a national publication, causing harm similar to the tort of public disclosure of private facts. We have explained that this tort "occurs when a tortfeasor gives 'publicity to a matter concerning the private life of another' and 'the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public.'" *Shields*, 55 F.4th at 828 (quoting Restatement (Second) of Torts § 652D (Am. L. Inst. 1977)). But critically, the publicity element "means the information is conveyed 'to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'" *Id.* (quoting Restatement (Second) of Torts § 652D cmt. a). And here, there is no allegation that the publication disseminated plaintiffs' names or

addresses to the public.[6]

Plaintiffs nevertheless assert that *Shields* supports finding standing here because the publicity element requires only "disclosure to 'someone *likely* to widely communicate' the private information." Rep. Br. 11 (quoting *Shields*, 55 F.4th at 829). And perhaps the publication here would be more likely to disclose information to the public than the company at issue in *Shields*, which merely conducted mailings for debt-collection agencies. *See Shields*, 55 F.4th at 829 (noting that plaintiff's "alleged harm was that one private entity (and, presumably, some of its employees) knew of her debt"). But the complaint is devoid of any allegations that the publication at issue here is substantially likely to actually disseminate plaintiffs' names and addresses (let alone that it actually did so). In sum, although plaintiffs need not "plead and prove the tort's elements" to prevail on their standing argument, they "had to at least allege a similar harm." *Id.* Because they have not done so, this asserted injury is insufficient for Article III standing.[7]

### D.     Deterred Speech on Nondefamatory Matters

Next, plaintiffs contend that because they "never defamed Dominion yet received cease-and-desist letters anyway, Dominion's demand deterred [them] . . .

---

[6] Plaintiffs contend that whether the newspaper "published the names or not is a fact outside the complaint." Rep. Br. 11 n.4. But it remains true that the complaint does not allege publication.

[7] To the extent that plaintiffs mention other torts in passing, they do not adequately brief any argument that such torts provide analogues to the injuries they assert in this case, so we decline to consider such arguments. *See Shields*, 55 F.4th at 829 (declining to consider inadequately briefed arguments for injuries related to other torts that plaintiff "thr[e]w[] out" but did not explain).

from engaging in *further* non[]defamatory speech." Aplt. Br. 23 (citation omitted). This is an argument for standing based on chilled speech, a theory that the district court rejected. And critically, plaintiffs explicitly abandon this argument their reply brief, asserting that they "d[o] not allege 'chilled' speech as an injury-in-fact." Rep. Br. 10 n.2. Given this express waiver, we decline to consider plaintiffs deterred- or chilled-speech argument for standing.

### E.     Violation of First Amendment Rights

Plaintiffs relatedly assert that the alleged violation of their First Amendment rights is an injury sufficient for standing. *See PeTA v. Rasmussen*, 298 F.3d 1198, 1203 (10th Cir. 2002) (holding that plaintiff had concrete First Amendment injury based on allegations that defendant police officers threatened to arrest protestors "if they did not cease their demonstration"). In support, plaintiffs argue that we must assume they will prevail on their claim that Dominion's letters constituted unlawful retaliation against plaintiffs' exercise of free speech in writing the affidavits—and must likewise accept plaintiffs' assertion of the necessary prerequisite for such a claim, that Dominion was a state actor when it sent the letters. *See Gallagher v. "Neil Young Freedom Concert"*, 49 F.3d 1442, 1447 (10th Cir. 1995) (explaining that "the only proper defendants in a [§] 1983 claim are those who '"represent [the state] in some capacity"'" (second alteration in original) (quoting *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988))).

For authority, plaintiffs invoke *Initiative & Referendum Institute v. Walker*, in which we stated that "[f]or purposes of standing, we must assume the [p]laintiffs'

13

claim has legal validity." 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc); *see also Day v. Bond*, 500 F.3d 1127, 1137–38 (10th Cir. 2007) ("Practically speaking, *Walker* mandates that we assume, during the evaluation of the plaintiff's standing, that the plaintiff will prevail on [the] merits argument—that is, that the defendant has violated the law."). As an initial matter, this assumption only applies when "the merits of the plaintiffs' claims mirror[] the alleged standing injury," so plaintiffs' asserted First Amendment injury could only support standing for, at most, their First Amendment retaliation claim (and perhaps their civil-conspiracy claim, which appears to be premised on the First Amendment violations). *Day*, 500 F.3d at 1137–38. More critically, *Walker* itself acknowledged that an injury for standing purposes requires a plaintiff to have a "legally protected interest"—a term that "has independent force and meaning" outside the merits of the underlying claim. 450 F.3d at 1093; *see also Spokeo*, 578 U.S. at 339 (describing standing injury as "an invasion of a legally protected interest" (quoting *Lujan*, 504 U.S. at 560)). As examples of such independent force and meaning, *Walker* offered a nonexclusive list of situations in which courts would not recognize a legally protected interest when assessing standing, including when a plaintiff's "claimed legal right is so preposterous as to be legally frivolous." 450 F.3d at 1093.

And here, plaintiffs' allegations seeking to establish Dominion as a state actor meet that standard. That's because under any of the four tests we use to decide whether a defendant's challenged conduct constitutes state action, the focus is on *the challenged conduct*. *See Gallagher*, 49 F.3d at 1447–48 (listing nexus, symbiotic-

relationship, joint-action, and public-function tests, all of which are "fact-specific"). The challenged conduct in this case is the sending of letters, which plaintiffs contend Dominion sent in retaliation for their affidavits. But as the district court recognized, plaintiffs' state-actor allegations "are only based on Dominion's role in supplying voting systems"; the complaint says nothing about how or why Dominion's conduct in sending the letters constituted state action. App. vol. 7, 94.

To be sure, the complaint includes *conclusions* about Dominion's state-actor status: "Dominion was and is a state actor and[,] in that capacity[,] engaged in First Amendment retaliation by sending . . . [the l]etters." App. vol. 1, 90. But even plaintiffs acknowledge that such assertions "have a conclusory feel." Aplt. Br. 41. And although plaintiffs argue that facts alleged elsewhere in the complaint support those conclusory assertions, that section of their brief tellingly lacks any citations to or quotations from their complaint that support their claim. Plaintiffs' allegations entirely fail to appreciate, recognize, or acknowledge the distinction between Dominion's general business of supplying voting systems and the actual conduct challenged here: sending the letters. Plaintiffs' claim to a legally protected First Amendment right is accordingly "legally frivolous," and their alleged First Amendment injury is not sufficient for Article III standing. *Walker*, 450 F.3d at 1093.

### F.    Compulsion

Plaintiffs' last asserted intangible injury is compulsion, premised on allegations that the letters required them to retract any prior defamatory statements, review and preserve their documents and communications, and respond to

Dominion's defamation counsel. But the cases plaintiffs rely on involved

"[c]ompulsion by unwanted and unlawful *government* edict." *Nat'l Collegiate*

*Athletic Ass'n v. Caifano*, 622 F.2d 1382, 1389 (10th Cir. 1980) (emphasis added);

*see also United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 900–03 (10th Cir. 2016)

(holding that United States had standing to challenge state professional-conduct rule);

*Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (concluding

that plaintiffs had standing to seek retrospective relief based on injuries caused by

city ordinance). And here, as with the asserted First Amendment injury, plaintiffs

have failed to allege any *government* compulsion. Because their assertions on that

point are "legally frivolous," their alleged compulsion injury is not sufficient for

Article III standing.[8] *Walker*, 450 F.3d at 1093.

In sum, none of plaintiffs' six asserted intangible injuries—intrusion upon

seclusion, confusion and emotional distress, public disclosure of private facts,

deterred speech on nondefamatory matters, violation of First Amendment rights, and

compulsion—are sufficiently concrete injuries for Article III standing on plaintiffs'

First Amendment, RICO, and civil-conspiracy claims.

## II.    Equal Protection Injury

We turn next to plaintiffs' assertion that their alleged violation of equal

---

[8] In their reply brief, plaintiffs suggest that *Cardtoons, L.C. v. Major League Baseball Players Association*, 208 F.3d 885 (10th Cir. 2000) (en banc), "shows that even a private party's cease-and-desist demand comprises an injury[] sufficient for standing." Rep. Br. 10. But *Cardtoons* did not address standing, so it provides no guidance here.

protection establishes standing for their equal-protection claim as well as their three other claims. The district court concluded that plaintiffs had standing for their equal-protection claim because "the Tenth Circuit has held that the 'injury in fact' in the equal[-]protection context 'is the denial of equal treatment' itself." App. vol. 7, 91 (quoting *ACLU of N.M. v. Santillanes*, 546 F.3d 1313, 1319 (10th Cir. 2008)). As an initial matter, this ruling ignores that an equal-protection claim under § 1983 (just like plaintiffs' First Amendment claim under § 1983) requires state action. *See Gallagher*, 49 F.3d at 1446–47 (explaining that Fourteenth Amendment and § 1983 both require governmental action and that private discriminatory conduct "is not subject to the Fourteenth Amendment's prohibitions"). Thus, our prior conclusion that plaintiffs lack a legally protected First Amendment interest because of their patently frivolous state-action allegations applies equally here and is sufficient reason to conclude that they lack Article III standing for their equal-protection claim. *See Walker*, 450 F.3d at 1093.

Additionally, the district court erred in its application of *Santillanes* here. That case involved an equal-protection claim arising from a voter-identification law under which in-person voters like the plaintiffs would have to present identification to vote, whereas absentee voters would not have to present such identification. *Id.* To support our brief and unexplained conclusion that "[t]he injury . . . is the denial of equal treatment," we cited *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993). There, faced with a challenge to an ordinance that gave preference to minority-owned business in

the award of city contracts, the Supreme Court held that the injury for standing

purposes was the "inability to compete on an equal footing" for the benefit of a city

contract, rather than the actual deprivation of city contracts. *Jacksonville*, 508 U.S. at

666. It explained that in equal-protection cases involving a government benefit, a

governmentally erected barrier "that makes it more difficult for members of one

group to obtain a benefit than it is for members of another group, a member of the

former group seeking to challenge the barrier need not allege that he would have

obtained the benefit but for the barrier" for purposes of standing. *Id.* Instead, the

Court reasoned, the injury in that kind of equal-protection case "is the denial of equal

treatment resulting from the imposition of the barrier, not the ultimate inability to

obtain the benefit." *Id.* Thus, viewed as an extension of *Jacksonville*, our holding in

*Santillanes* does not stand for the proposition that in all equal-protection claims, the

alleged denial of equal protection suffices for standing purposes. Rather, that is true

only for cases involving a denial of a benefit or opportunity. *See Jacksonville*, 508

U.S. at 666 (explaining that this rule applies to "an equal[-]protection case *of this*

*variety*" (emphasis added)).

    This is not such a case. The letters that plaintiffs received do not erect a barrier

or hurdle between them and some benefit or opportunity. Instead, plaintiffs allege

only that by sending the letters, "Dominion disfavored and discriminated against

the[ir] conservative political viewpoints." App. vol. 1, 88. There is no accompanying

allegation that, for instance, Dominion's letters denied plaintiffs the opportunity to

obtain a benefit on equal terms with those who hold liberal political viewpoints. And

to the extent that plaintiffs assert being denied the opportunity to participate in national debate following the 2020 election, that is simply not the same kind of opportunity or benefit discussed in *Santillanes* and *Jacksonville*. Thus, the district court erred in determining that the alleged denial of equal treatment was an adequate standing injury for the type of equal-protection claim plaintiffs assert here. And because plaintiffs lack standing for their equal-protection claim, it can't confer standing as to their other claims, either.[9]

## Conclusion

Because plaintiffs affirmatively waive a chilled-speech injury and fail to allege any other concrete injury as to their claims, they lack standing. We therefore affirm the district court's dismissal order, except to vacate that portion of the order dismissing the equal-protection claim with prejudice and remanding with instructions to instead dismiss that claim without prejudice. *See Shields*, 55 F.4th at 827, 831 (holding that plaintiff lacked standing and affirming dismissal without prejudice).

Entered for the Court

Nancy L. Moritz
Circuit Judge

---

[9] Given this holding, we need not consider whether any equal-protection injury could extend to support Article III standing for plaintiffs' other claims. We also need not address any of defendants' alternative arguments for affirming.

22-1361, *Cooper v. U.S. Dominion, Inc.*

**HARTZ**, J. concurring.

Plaintiffs may have been able to show standing in this case. For example, they may have been able to establish that a reasonable person in their position would be deterred from engaging in nondefamatory speech about the election because of Dominion's threats. *See Initiative and Referendum Inst. v. Walker*, 450 F.3d 1082, 1087–97 (10th Cir. 2006) (en banc); *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1164 (10th Cir. 2023). And as for other potential grounds for standing, I have less confidence than the majority that Plaintiffs lack standing on all theories raised on appeal.

In my view, however, Plaintiffs did not adequately present any theory of standing in district court. Their response to Defendants' motions to dismiss addressed justiciability in only two pages. They first argued their claim is ripe. They then wrote:

> [T]he Complaint alleges damages from RICO violations, denial of equal protection, deprivation of First Amendment rights, and injuries arising from overt acts of a civil conspiracy, all of which flow from Defendants' coordinated Lawfare campaign directed against Plaintiffs and the proposed Class in order to silence a national debate over election security and voting system reliability. Defendants threatened to bring spurious defamation litigation in Letters and in a nationwide public relations campaign soon after the Election. These threats have already been made and caused concrete injury including property loss and economic damages to Plaintiffs and members of the proposed Class.

Aplts. App., Vol VII at 49 (internal citations omitted). This discussion does not preserve any standing argument. In particular, with respect to chilled speech it is not enough to baldly assert that they have been deprived of First Amendment rights without describing

the deprivation and why it supports standing.[1] And although the passage does mention property loss and economic damages, it does not describe the loss or the damages or make any effort to explain why they would suffice for standing here.

I therefore concur in dismissing this appeal for lack of jurisdiction. If Plaintiffs had argued on appeal that dismissal for lack of standing was plain error, we may have been able to review the unpreserved issue. But "[w]hen an appellant fails to preserve an issue and also fails to make a plain-error argument on appeal, we ordinarily deem the issue waived (rather than merely forfeited) and decline to review the issue at all—for plain error or otherwise." *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019).

---

[1] Strangely, Plaintiffs' district-court brief cites *Walker*, 450 F.3d 1082, which contains a thorough discussion of standing based on chilling; but it is cited only to support the proposition that "a claim is ripe for review when the plaintiff's alleged injury is already occurring at the time the lawsuit is filed." Aplts. App., Vol VII at 48.